We will hear argument first this morning in Case 21-404, United States v. Washington. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the Court. First, this case is not moot. We acknowledge that Washington's recent enactment of SB 5890 makes it uncertain whether a decision invalidating HB 1723 will ultimately produce any financial benefit to the United States. Under this Court's precedence, however, the case is not moot so long as there is a reasonable possibility that such a benefit will ensue. Respondents have not carried their heavy burden of negating that possibility. Second, HB 1723 discriminates against the federal government and those with whom it deals. On its face, it is limited to a specific federal facility, and even within that facility, it applies only to workers engaged in the performance of federal contracts, not to state or purely private workers. Third, HB 40 U.S.C. 3172a does not authorize that discriminatory treatment. Properly understood, Section 3172a authorizes Washington to apply even-handedly to federal facilities the same workers' compensation laws that apply in other workplaces in the state. It does not authorize Washington to subject federal contractors at the Hanford facility to uniquely onerous burdens. I welcome the Court's questions. Mr. Stewart, could you give us a more fulsome explanation of the financial interests of the United States in the case considering in the context of the mootness Well, before SB 5890 was passed, there was no question that the United States had a financial interest in the case. That is, even though the financial burdens would fall in the first instance on the federal contractors, the United States has entered into various arrangements whereby it would absorb those costs, and most significantly, it's entered into a memorandum of understanding with the state agency whereby it would act as a self-insurer and would pay any increased workers' compensation costs attributable to most of the federal contracts on the site. And so the question for purposes of mootness is whether the enactment of SB 5890 has effectively divested the United States of that financial interest. And the respondents have identified two possible reasons that that might be so. First, they've said SB 5890 covers all of the workers who were previously covered by HB 1723 and some more as well, and therefore it says even if we were able to get the workers' claim under HB 1723 declared invalid or set aside, it wouldn't produce any financial benefit for the United States because the worker could always refile under SB 5890 and could obtain the same benefits on the same terms. We think it's not a natural construction of the new statutory language to say that the coverage would be co-extensive in that way. HB 1723 applied to all DOE Hanford facility workers at specified but broadly defined locations within the Hanford site without regard to the proximity of their work to the actual storage or treatment of hazardous waste. And by contrast, the crucial language in SB 5890 is structures and their lands where specified categories of waste are stored and disposed of. And the phrase structures and their lands is not self-defining, but you would imagine that the lands are areas outside the structure that are in fairly close proximity to the structure itself. We've identified two types of structures. One is a waste treatment facility at the center of the site that is currently under construction, meaning that waste will ultimately be treated there, but that's not happening yet. And that workers at that facility would not naturally be said to be working on structures and their lands where wastes are being treated or disposed of. The same thing applies to some of the Hanford office workers who worked in structures where there were no hazardous wastes. So we think that there's at least an open question whether some of the workers who were covered by HB 1723 would be covered by SB 5890. The second mootness argument that the state has made in its letter of last Monday was that under the effective date provision of SB 5890, that law will apply to all future stages in any pending controversy about a particular claimant's entitlement to benefits under the law. And so, for example, if a claimant was DOE and then has an appeal pending to the state industrial board, Washington's view of the law now is that if the claimant is not covered by, even if the claim was submitted before SB 90 was enacted, if the claimant was covered by HB 1723 but not under the new law, the claimant will not be entitled to benefits because the new law will govern not only new claims but additional stages in the processing of an existing claim. And it's possible that the Washington courts will sustain that reading, but any claimant who was covered by the prior law and not by the new one can be expected to resist it. And so we think that there's at least a reasonable possibility that the courts would ultimately hold any claimant in that position would be entitled to benefits if HB 1723 remains operative. And so to summarize, it was clear before the enactment of SB 5890 that the United States would suffer harm, financial harm, from this law and the new developments that the state has pointed to don't eliminate that possibility. Do you think if this was the position you were in when you had to make a decision to file for a petition for certiorari, you would have filed? If they had enacted the law between the time of the Ninth Circuit's decision and the time when a petition for certiorari had been due, we might not have filed. We might have filed but asked simply that the court vacate the judgment below in light of the reduced practical effect of the law, even if we didn't think of it. I guess that's what I'm here to vacate the judgment below, you know, much more than whatever residual possibility there is that these claims will affect. We would certainly like to have the judgment below vacated and we would also like for the court to provide affirmative clarification as to the scope of 3172A and certainly when a case is not technically moot but the court is deciding is this a wise use of our resources to issue a merits ruling, the court would typically take into account how likely is it that the legal principles involved will bear on the resolution of future cases. That's not a basis for finding the case not to be moot, but if it isn't moot, it's a basis for exercising the court's discretionary powers. The second thing I would say is we also have an interest and we think the court has an interest in avoiding the sorts of post-certiorari maneuvers that it's that is if the state before a cert petition was due had amended the law in the way that it has, it would have effectively been giving up on the possibility of applying HB 1723 on into the future with its full coverage and this the state was unwilling to make that sacrifice at the time whether when it was unclear whether this court would grant review and so we think that there is an interest in terms of the court's sound management of its docket, again, if the case is not moot, in issuing a decision on the merits so that that sort of maneuver will be discouraged. Mr. Stewart, I have to say I'm not quite sure I understand how 3172 works. The question is whether or not if the state owned the facilities, the workers' compensation law would still work the same way, right? That's where the anti-discrimination principle comes in? Yes. Well, how does that work? I mean, is there any doubt that if the state owned these facilities that they would apply the state workers' compensation rules to those to the workers? Well, the language refers at the outset not to the state legislature but to the state authority charged with enforcing and requiring compliance with the state workers' compensation laws and here that's Washington's Department of Labor and Industries which is referred to as L&I and then it says it can apply those laws in the same way and to the same extent to the federal facilities as if the premises were under the exclusive jurisdiction of the state and with respect to HB 1723, the presumptions of workplace causation that it adopts, these are not substantive rules that L&I could apply to any other facilities anywhere else within the state of Washington. I'm sorry, could you break that down? I know that's what it says but I don't understand. I don't understand why if there weren't a federal facility here but it was a state facility, would those workers be covered by the state workers' compensation laws? Yes, that's correct and the state could have adopted a law that applied the HB 1723 presumptions throughout the state and if the state had done that, then 3172A would have authorized those presumptions to be adopted at the federal facility but the impetus behind the enactment of the statute was a decision of this court in Murray in 1934 which said because a particular accident occurred on a federal enclave and because the federal enclave doctrine said state laws enacted after the property was ceded to the federal government can't be applied to the federal facility, the worker's survivor was not able to obtain survivor's benefits under the generally applicable state law and so what Congress decided to do was to pass a law that said whatever you were doing in the rest of the state, you can do on the federal facility and the way that the court in Goodyear Atomic described it was to say on its face, 3172A allows the worker, dictates the same treatment of workers at the federal facility that they would receive. I'm just sorry, I was just going to say I didn't quite, I mean you talked about what the impetus of it is but if you look at the language, it says, I mean if this were a state facility, would the workers there be subject to the state workers' compensation laws? I think you can do, yes, I think you can do the comparison in either of two ways. You could ask if Hanford, well, if Hanford were operated by the state, then the state could do it but if the question is what would the state authority be able to do on other land within Washington that was subject to the exclusive jurisdiction of the state, the answer to that question would be no, nothing in HB 1723 authorizes L&I to apply these presumptions of workplace causation to land anywhere else in Washington and to the extent that the language is ambiguous, then reading it. You'll give me at least that? I would give, yes, I'll give you that it's the other side's reading is as strong as ours because I think if you look at Goodyear Atomic, if you look at what precipitated this, if you look at kind of the distinctly disfavored nature of laws that discriminate against the federal government, it would really be a stretch to read this language to say that even though Washington is not doing this anywhere else in the state, it can do it at the Hanford facility because it would be able to do this if no question of intergovernmental immunity were posed. I had the same problem as the Chief Justice and I still don't understand the answer. I don't understand what the counterfactual is. This is the closest I could come but this is probably off the mark. You'll tell me why. Imagine it's a state facility, it's owned by the state but there are federal contractors working there. Is that the situation we have to imagine? No, I think when they talk about land under the exclusive jurisdiction of the state and the court in Goodyear Atomic said on its face the federal law requires the application of the same laws that would apply to purely private facilities within the same state, in that case Ohio. And so I think the relevant comparator is not what if we were looking at the same tract of land, the Hanford facility, but asking what the state could do if this were under its own exclusive jurisdiction. It's what rules could LNI apply to other tracts of land in Washington that are in fact within the exclusive jurisdiction of the state. It may not be the only reading of the text but it's consistent with the impetus for enactment of the law, it's consistent with the non-discrimination principle, it's consistent with the court's characterization of the effect of 3172A in Goodyear Atomic. All your stronger arguments, I think, are non-textual arguments. I mean, Goodyear is a sentence in a case that was not about discrimination at all, so I think I'm going to put that to one side at least. You have very strong arguments about the impetus of the law, you have very strong arguments about if this were read as the state wants it to be read, it would stretch quite broadly and maybe it just seems like not the kind of thing that Congress would do. But if you look at the text here, I mean, I'm sort of struggling to read it your way. As the Chief Justice says, it just says, if the state were in charge, could the states do it? And obviously the states could. Well, again, the law is not directed at the state legislature. It doesn't talk about what state legislature could enact. It's addressed to the state authority charged with enforcing and requiring compliance. And so LNI's authority is limited to the enforcement of laws that actually exist. And so if you ask what could LNI do on premises within the exclusive jurisdiction of the state, if the point of reference is other places within the state of Washington outside the Hanford facility, it is, it could not apply presumptions of this sort because there's no state law that authorizes it to do so. Even if you're talking about the circumstances in which you had a hypothetical Hanford facility that it was on the same tract of land but did not use federal contract workers, used exclusively state and private workers, LNI couldn't in any meaningful sense enforce the presumptions as they are set forth in HB 1723. Because HB 1723, by its terms, refers to DOE Hanford site workers. It's even within that site, it's limited to the federal contract workers on that site. So what extent does your argument depend on identifying it as a federal facility? Suppose, excuse me, there is one facility in a state where the risk is much higher than any place else in the state, and therefore there's a justification for flipping the causation requirement. And it just so happens that the only workers working on that site are federal workers. So the site is not identified as a federal facility by name. It's identified based on the characteristics of the site that are thought to justify the change in the causation rule. Would there be a problem there? I think there would be a potential problem, but it's a much harder case. And one of the things we would like to know in that circumstance is, did the state single out that facility because it was a federal facility, or did it single it out because it truly believed that the risks there were higher than anywhere else? Yeah, okay, so it comes down to a question of to take another hypothetical. If a state imposed a special tax, a higher corporate income tax on profits that private firms earned by producing and supplying military equipment. Now, a law like that might not refer specifically to the federal government, but it would have an evident likelihood of discriminating against federal contractors because military equipment is most likely to be bought by the federal government. Now, if a state legislature tweaked the definition of military equipment to ensure that it swept in a little bit of stuff that was typically bought by civilians, that shouldn't be good enough to save it. But we acknowledge that the law with respect to those types of statutes is underdeveloped. They pose much harder problems. I think the reason that we have pursued this case so vigorously is that it forms of explicit discrimination against the federal government. I'm sorry. Well, this problem that Justice Alito is hypothesizing in your answer goes to the potential problems that you reserved in your brief with respect to the new law, right? Yes. Because if you're treating, and it's not a question of legislative intent, right? It's a question of looking at the facial classification and saying, are the desk workers at this site subject to any greater risk than, say, firefighters or miners? It's a question of identifying the relevant categories of risk. That would be important, but it might also turn on legislative intent. For example, in the equal protection area, even where it is necessary that a plaintiff show intentional discrimination, I was subject to adverse treatment because of my A plaintiff can sometimes make that showing by establishing that the state adopted a facially neutral criterion but adopted it because it correlated with race or sex. I think it's rarely successful, but it is commonly understood to be an available method of proof, even in equal protection cases where the plaintiff has to show intentional discrimination. So I think part of the inquiry with respect to SB 5890 would be, did the state single out this particular category of workers because it understood that the large majority of them would be federal contract workers, or did it enact the law because it was concerned with the dangers imposed by these occupations without regard to the identity of the entity that it would ultimately bear the presumption that a waiver has to clearly and unambiguously waive governmental immunity? As my colleagues have pointed out, the language here is a waiver of immunity, but there is some ambiguity as to what the extent of that waiver is. And so given that your opposing counsel points to a number of statutes that very clearly say you can't discriminate against the federal facility or federal employees, they have very expressed language about being treated equally, which this statute doesn't. Why doesn't that show us that if it's an ambiguity as to the scope, that the scope is as broad as the language supports? Well, first, I think the general rule, and this is not just with respect to intergovernmental immunity, it applies to immunities from suit generally under decisions like FAA versus Cooper. The general rule is, even when Congress has clearly manifested its intention to waive immunity to some degree, disputes about the scope of that waiver are themselves subject to the clear statement requirement. The second thing is, we do think that Congress manifested an intent to import a principle of nondiscrimination into the statute. That is, it defined what the state agency can do on federal facilities with respect to what, by reference to what the state agency could do on premises within the exclusive jurisdiction of the state. And so we think it's natural to say that was importing the nondiscrimination requirement that has always been central to the court's intergovernmental immunity decisions. The third thing I would say is, we went for 80 years after this statute was enacted, before any state appears to have read it, to authorize the sort of targeting of federal facilities that Washington has done here. And so if the law were truly ambiguous, or if the better reading of the law were as the state represents, we would have expected states to explore their options before that time. Well, but I mean, maybe it has to do with the fact that there aren't very many places like Hannaford, right, where you have a situation where basically anybody there is subject to great concern, unlike other places. I mean, are there analogous places in the rest of the country where a state might be concerned about the workers' compensation regime, because it's a particularly hazardous environment that people have been working in? I don't know of specific analogs to Hanford. Now, Congress has enacted a statute of its own, the EEOICPA, which is not Hanford-specific, but it's specific to workers in the atomic weapons sector. It encompasses people like some of the Hanford workers. It also encompasses people engaged in uranium milling or mining. So there certainly are other workplaces within the country where workers are subject to some of the same dangers. But the whole point of the it's apparent that the federal government is going to be fitting the bill. States may often feel a temptation to kind of benefit some class of their own residents to an exorbitant degree with the understanding that they won't be, the state itself won't be required to absorb the costs. The last thing I would say about Goodyear Atomic, and I agree with you, Justice Kagan, that the point at issue in that case was not whether a discriminatory state law would pass constitutional review. Nevertheless, the fact that this was this court's instinctive reaction to what the language meant should tell you that it's at least a plausible reading. And I'd also point out that Congress recodified the provision with some minor changes in the interval within, between Goodyear Atomic and the present, suggesting that Congress was satisfied to read the statute as imposing a nondiscrimination requirement. What do you think this statute would have to look like for it to mean what the state of Washington says this one means? I mean, I think it would have to say something like the state legislature and or the state authority can impose on facility, federal facilities or facilities within the exclusive jurisdiction of the government, whatever workers' compensation laws they choose. And to make doubly sure it might say without regard to principles of intergovernmental immunity. And I think that's another textual point that under the state's view of the law, it's really not clear what work the language about in the same way and to the extent as if the premises were within the exclusive jurisdiction of the state. When you said especially, you know, to be double sure it has to refer to a waiver of immunity. I mean, do you think that the statute basically given the breadth of this, of what's the state of Washington is saying here, that there has to be an express waiver of immunity? Well, I think with regard to anti-discrimination in particular, that is, it's relatively commonplace for the United States to engage in the sort of waiver that we think it engaged in here, namely an authorization for the state to apply certain of its own laws even handedly to federal facilities. It requires some express congressional authorization, but it's not especially unusual. We don't know of any analog to a hypothetical version of 3172A that would tell the state you can impose discriminatory workers' compensation laws on federal facilities. Thank you, counsel. Justice Thomas, I think. Justice Breyer. Felina. Justice Sotomayor. I do have one. Mr. Stewart, I just want to make sure that I understand the textual hook. As it's been pointed out, the statute's not a model of clarity, but I guess for one, I do see a textual hook for your argument, and I want to be sure that I'm correctly understanding it. You say that 3172 is aimed at the executive essentially, not at the legislature, and you get that from this language that says, state authority charged with enforcing and requiring compliance with, in the beginning, and then awards of the authority may apply the laws of all land to all land and premises in the state which the federal government controls. So yours isn't completely unmoored from the statute and rooted in purposes, right? Yes. I mean, I think what it is saying is the state authority here, LNI, can apply to the federal facility whatever substantive body of worker compensation rules it could apply in the other parts of Washington that are within the exclusive jurisdiction of the state. So the limitation, so your position is that if there's an otherwise existing extant body of generally applicable law, the Washington agency charged with enforcing that law can apply that extant body of law to federal facilities, and that that's what 3172 authorizes by that language that I just quoted. Yes, and the only clarification I would make is when we say extant, certainly Washington could update its state laws even after 3172A was enacted. It's not like the federal enclave doctrine where you look at a certain point in time and you ask what state laws were in effect there. But so long as it does that on an even-handed basis, the Washington administrative agency can apply to the federal facility the same laws it is authorized to apply in the rest of the state. Thank you. Thank you, Mr. Chief Justice. Ms. Hines. Mr. Chief Justice, and may it please the court. To protect workers on federal projects like the that allow states to regulate federal contractors using all the same tools we can use as to any private actor. That waiver allowed Washington's former law that is challenged here. But ultimately this court need not decide this issue because this case is moot. The federal government is asking you to issue a constitutional ruling invalidating a state law that no longer exists and that has no ongoing effect. This court should decline and should instead vacate the decisions below and remand for further proceedings. The government concedes that there is no prospective relief that this court can grant as to Washington's former law. Because the state has already eliminated the provisions that are challenged here. The only reason the government argues that there is still a live controversy is because it assumes that invalidating Washington's former law could still impact the small number of pending claims that were initially filed under the old law. That is incorrect. Washington's presumption statute applies retroactively. So the revised law will govern any pending claims for benefits initially filed under the former law, even those cases on appeal. The government speculates that there may be individuals whose pending claims were filed under the old law and that would not be covered under Washington's revised statute. But even if that were true, those claims would now be rejected under Washington's revised statute. Thus if this court were to reach the merits and either uphold or invalidate Washington's law, it will have absolutely no effect on any worker's right to benefits or the government's finances. This case is moot. I welcome the court's questions. Counsel, wouldn't your case be much stronger if what you just said had been found to be the case by the Supreme Court of Washington? Your Honor, what I did say has been found at least in principle by the Washington. No, I mean in the context of the statutes that we're talking about. Certainly, if the Supreme Court had issued a ruling directly on point in this case, it would be stronger. But what we're asking this court to acknowledge is settled principles of Washington and federal law that when a statute is retroactive and the statute here is expressly retroactive, when it is retroactive, then courts have an obligation to the legislature or Congress to honor that retroactive intent and to apply that law to all pending cases, even if it ultimately changes the outcome. Do you think someone who has benefited from the old law and who would like their benefits updated for changed circumstances would agree with you, or would they rather simply pursue their case under the old law, which was the basis for their benefits in the first instance? Your Honor, I have two points. First, a worker that had previously had a claim under the old law would not have a vested right to fight a retroactive application of the new law until there has been a final judgment. Once there's a final judgment, then there's a due process right that is vested, and there can be an argument by the worker. But as to all pending claims, there is no such vested right, and so there is no argument by the worker that the law cannot retroactively apply to those claims. As to the closed claims, and there's about 160 of those claims, approximately, sorry, 140 of those claims, those claims have been adjudicated now to final judgment. The federal government had every opportunity to challenge the constitutionality of the old law in those cases. It chose not to do so, and those claims are now final. So there is no ability by the federal government to re-litigate the constitutionality of the old law in those cases. There is a small exception under Washington law that allows a worker to reopen only the amount of the benefits, or the need for additional medical services, but that does not allow re-litigation of the determination that they suffered an occupational injury. Res judicata would still bar re-litigation and the federal government challenging the underlying statute, so that if this court issues a constitutional ruling, it will have no impact, either on the pending claims or on the claims that are already closed, which is a closed universe of only 200 claims total, 66 which are pending, and approximately 140 that are closed. Thank you. Well, I mean, your argument depends upon a prediction about what the Washington State Supreme Court is going to do. Yes, Your Honor, to some extent, but this is settled law. We're not asking you to accept our opinion on the issue. The Supreme State Supreme Court has been very clear in the state of Washington that if a legislation is enacted and it is intended and explicitly retroactive, the courts have an obligation to the legislature to apply that law retroactively. Well, but we have pretty rigorous standards when, particularly after a grant of certiorari, the respondent undertakes certain efforts to moot out the case. It has to be, I forget what our language is, you know, beyond any doubt or something like that, and I think if you just acknowledge there are a number of cases where the issue would still be alive. And however confident you are about your prediction of your state Supreme Court, you know, sometimes predictions don't pan out. Courts do unusual things. Understood. So isn't that enough of a continuation of the impact of the controversy, given the rigorous in some kind of a gambit? But maybe it was a sincere effort to make our work a little better, but it is not totally, the case is not totally out of, you know, any significance at all, I don't think. Your Honor, I would have two responses. First, I would just point out that Washington's legislature is just a part-time legislature. They only meet for a couple of months each year, and so since the last time the legislature met and the legislative session that started earlier this year, there have been a number of significant events that have crystallized and narrowed the federal government's claims, and so the state legislature was responding in good faith to those developments and trying to ensure the continuity of benefits. But as to your other question, Your Honor, um, my apologies. Your other question was about, um, the state... Don't expect me to remember. When the state legislature acts here, or about the retroactive application, this is a much more attenuated case than this court considered in the New York State Rifle Association. Here, there is no claim of a live controversy in the case in chief. The federal government only sought an invalidation and a declaratory judgment. They asserted no damages here. They're not claiming they can assert damages. So they're talking about potential collateral consequences in other cases that are based on a number, a series of speculative events that might occur in the future. If an office worker tries to reopen their case, if the Washington courts determine that there is no, that the statute, the new statute and the old statute are not coextensive, if that office worker's claim falls within the gap of the coverage, if Washington courts do not apply res judicata to preclude relitigation of their claims, then maybe there might be some ongoing application. But that is not the type of live case or controversy and present controversy that this court has ever held as sufficient for Article III purposes. Counsel, if you say it's so clear, I mean, I thought the government made, I thought was a decent point in its letter response. You didn't identify this retroactivity argument until your fourth submission regarding mootness. And if it was that clear, why did you wait so long to make it? Yes, your honor. And the state sincerely regrets that and wishes that we had raised that issue sooner. To be clear, the state understood immediately that this statute was retroactive. What took a little longer to understand and which we learned in the course of implementing the law was that the state courts would apply this retroactive legislation to all pending claims on appeal, even if it means changing the outcome of the litigation. And that was an oversight. But there is no uncertainty in the state of that law. That is settled Washington law. It follows settled federal law. There is no real ambiguity about the application of that law. Well, one of the arguments you make in your briefing is that even if we did not raise to our very high bar of mootness, that we should vacate this case. And I want to know whether you found any precedent for us to do something like that at this stage. Well, your honor, there is certainly precedent that the court has broad jurisdiction to decide the issues that sort of merit this court's consideration. And I think particularly, whereas here it would require invalidating the laws of a sovereign state, there are factors that would suggest that this court, even if it doesn't find it moot, certainly finds that the stakes have been substantially decreased. And it does not warrant invalidating a state statute. I understand the argument that we might dismiss the case if it's not moot, but for some reason no longer of great significance. And I think that was your response to Justice Kagan. But you're asking us to vacate a judgment. And if it isn't moot and it isn't wrong, on what authority could we do so? Because that is what the court has done in the past, when there's been a change of the legislative scheme. That is the reason that the case has been mooted out. Mootness, yes. But I think Justice Kagan's question, and this is why I'm popping up, is I think Justice Kagan's question, if I understand it correctly, is suppose it isn't moot. Suppose we have a live controversy, small though it may be, some still love it, all right? And suppose we think the judgment below is correct. How can we vacate it? The court would have, I don't know the grounds on which this court would vacate it. Neither do I. That's why I'm asking you. Understood. Understood, Your Honor. Okay. All right. If you don't know the answer to that question, good. That makes me feel better because I don't either. I ask you what they say. We assume this new law sweeps back and avoids this problem. They say there are 66 people. Maybe there are a few more, a few less. There are 66 people who worked at Hanford. They sued under the old law. They got compensated under the Washington statute, and those are on appeal. And you say, do not worry, because as to those 66 cases, this new law will come along, and since it says it's retroactive, it will apply to them too, and they'll follow that, and the thing will be wiped out. All right. But they say, read the new law and read the old law. The old law applies where there is, what is it? It's geographically defined, the area where it applies. It's Hanford's decision. Geographic areas which collectively span hundreds of miles. The new law applies to workers who work at any structure in its lands. So when I read that, maybe there are several federal workers who are busy on a river at Hanford cleaning out muskrat nests, and they are nowhere near a structure where particular forms of waste are disposed of except by the muskrats, which have nothing to do with this. So they say, well, how do we know they're going to be wiped out? And you say, well, because there's clear Washington law on that subject. I would be willing to bet that there isn't clear law on the geographical scope of muskrat nests in the state of Washington. So when I read that, I thought, I don't know, and therefore I couldn't. Now, that's my problem with your argument, and if it's a real problem, well, then I can't really say it's moot. I understand, Your Honor, and there are actually two separate mootness arguments here. The much more straightforward argument is that because this law applies retroactively, whether or not the worker who has a pending claim, whether they can continue to assert that claim under the new law will be determined solely by application of that new law. It requires no reference to the old law at all. You just have to look at the geographic scope of the new law. If they have a claim... These claims they already got. They were paid, and the government wants its money back. Yes, Your Honor, but the retroactive application means that it says, oh, the new law didn't, the old law doesn't exist. And so if they have a claim under the new law, they can proceed. If they don't, they... Oh, I get it. Okay. So your point is Washington law is absolutely clear. This is the situation. It said retroactive in the new law. So even if you run in 14 courts in, because they're stacked up there in Washington, and you're now at the court number 13, and yeah, you won, you won, you won, you won. Bad luck. The government's going to come in, and we will say in, the government will say only the new law applies. So it doesn't matter whether you're working with Muskrat or any, either you were or you weren't. And if you were, the bad luck, and if you were, whatever. Okay. Exactly. And the authority for that under Washington law is? The state of Hamburton, which follows the Pluitt case. And that is settled law, and it's settled in multiple different cases. So these are two separate mootness arguments. I appreciate your concern that we not exceed our article three jurisdiction and decide something that's not a live case or controversy. But other than that abstract concern, why do you care if this old law is void, dead, has no effect? Why are you fighting so hard to prevent us from doing the right thing? The state has an interest in ensuring that this court address live cases or controversies. And, and we do still believe that the way the old law fell within the scope of the waiver. It's just no longer a live case or controversy, but as acknowledged, the waiver language is very broad. It uses the term exclusive jurisdiction of the state. That language does not really permit distinguishing between different types of intergovernmental immunity as, as would be suggested. But do you think it allows, it allows a state to single out a federal facility by name? Your honor, it could do that. If the state could do that with respect to a private actor, which we think the state could, then it is permitted by under this waiver provision. And I would just note that at the time that this waiver statute was initially passed in 1936, states had already adopted workers' compensation schemes that chose, that treated different employers differently based on their circumstances. Well, the state could single out a private facility. And that the only, what would be the defense against that? A rational basis of equal protection review. That's it. So basically you think that this means nothing. I think that this waiver permits differential treatment of the federal government because it could do with respect to a private actor. And it could do that with respect to federal employees. Yes. Not just employees of contractors. No, your honor, the federal employees are governed by a separate federal statute, the Federal Employee Compensation Act, which has a preemption provision. So this statute, even from the time it was first passed, only ever applied to federal contractors, which are private employers. And so Congress understood that. But if you look at the language of the statute, and if you take it to be as broad as you say, the language is, why wouldn't, why would preemption principles apply? Your honor, because pre, I have two responses, but first preemption applies even under the state's exclusive jurisdiction. So what you're looking at is what the state could do with respect to a private actor on state land. Even in those situations, the state cannot conflict with federal law. It is still bound to ensure that it doesn't interfere or conflict with federal law. It would similarly, those preemption principles would apply under this. And so as this court recognized in North Dakota of the United States, preemption and intergovernmental immunity are two separate obstacles or barriers to state limit regulation of federal contractors. I don't understand where it is that the state has exclusive state jurisdiction. Maybe I'm just being dense about this, but it seems to me that the supremacy clause stretches everywhere. So you just said in response to Justice Kagan, that preemption wouldn't apply if it was the state's exclusive jurisdiction. Wouldn't that presuppose that Congress had already waived some sort of immunity or already said, we just cede our authority over this particular piece of territory to the state? Your honor, preemption principles would apply. So this does not waive preemption. This waives only intergovernmental immunity and territorial jurisdiction. And those are incidents of federal jurisdiction. But even in the state's exclusive jurisdiction, when it's regulating a private actor on state land, it is still bound to comply with other federal statutes. But the state doesn't have exclusive jurisdiction, right? Except insofar as Congress might allow it to. Right. Your honor. And so the exclusive jurisdiction of the state, that term is referenced to a virtual control, um, that generally occurs with state regulation of private actors on state land. There is still like constitutional limitations and limitations of federal statutes that apply in those situations, but territorial limitations and limitations of intergovernmental immunity would not apply. But you're saying that this would be so, that the federal government was so deferential to the states here that if we read the waiver, as you propose, Congress is essentially saying to the states, you can impose whatever rules of workers' compensation liability you want. So here you could say it was strict, strict liability because this was a really hazardous site. And so if there's any kind of injury suffered by a federal contractor on this site, you know, there might be an award of a million dollars. That would be fine. It would depend on if the state could do that with a private regulator. Let's say it could. Yes. So in that circumstance, this doctrine would not provide a limitation. If there was a conflict with some other federal statute, and there are often federal statutes at play when you're talking about significant federal functions or federal enclaves, there's all kinds of statutes that would be at play. If there was a conflict with one of those federal statutes, then that would still be a limitation. But intergovernmental immunity would not be that limitation. And Congress was just making the determination that states could use the full authority that they have over any private or, or state actor or employee and apply the same rules that they would apply in those circumstances. There is a difference. I mean, that is exactly the question that is bothering me. I mean, one day in the legislature, a group of federal employees from Hanford show up and they say, you know, it's tough being a federal employee. People in the state make much more money. We have more dangerous jobs. And the state laws generally are pretty fair to their workers, but try working for the federal government. This is supposed to strike a chord of agreement. So they say, now you can't do much for us because you're a state legislature, but I'll tell you one thing you can do. What you could do for us is you give us, if we're hurt and define hurt very broadly, please. So that if we even hurt a little bit, we get millions. Now we got to watch that number because, but, but really it's high. And you know, the wonderful thing, if you make private employers pay this in the state of Washington, they are voters. So you have to worry about them. And if the government pays for it in the state, well, that's a problem. You're gonna have to raise taxes, but you know, who's paying for this one? The feds, the feds will pay the taxpayers in the other states. So let's go and really hit the ceiling and we'll really pay a lot of money and we won't have to pay for it. Okay. I know projects like that. I won't say which they are, but there we are. Now to me, did I think Congress intended that? Hmm. It's going to take quite a lot of doing before I think they wanted that result. Now that's, that's where I am. So what do you think? I understood your honor. Congress has the ultimate political check here. They can always amend this statute, but they used very broad language. They use the term exclusive jurisdiction of the state. They knew it was very broad language. That exact term was used in Merrick v. Garrick. So the case that they were responding to used exactly that same type of language. They understood that they were granting a broad authority. If they don't like the policy later, they can amend the statute, but that is not a basis to ignore the plain terms of this language, which allows the state to treat the premises as if it were under the exclusive jurisdiction of the state. Ms. Hines, I think the text, but why would Congress have done that? I mean, we can't really believe that that's what Congress meant to do. And if you take all the other statutes, which you gave us and you said, look, the text is different. And you're right. The text is different. But at the same time, we know that Congress has a kind of modus operandi with respect to this. And it basically always says whatever you do elsewhere, you can do for facilities like Hanford. It doesn't say, you know, whatever you could dream of doing elsewhere, but actually wouldn't, you could do to federal facilities. And I think that that's what Justice Breyer is asking. Like, what sensible Congress would have written the statute the way you say it ought to be read? Well, there are a number of points, Your Honor. They were regulating primarily private employers. And so they could have reasonably assumed that those private employees who act as federal the federal contractors did participate in the state legislative process. And second, Congress could very well conclude that the type of workers' compensation schemes that had already been enacted by the states, which allows distinguishing between different employers based on the specific risks of that employer, based on their specific safety profiles, based on all of the distinctive features of that employer, that that should apply with as much force to these private entities that were governed by this waiver. And that's a very reasonable decision. Maybe Congress did not anticipate that it would be taken this far, but we're not really doing anything differently than what was permitted before in that Hanford is a unique site. It is the most toxic workplace in America. The employees there are around 56 gallons of toxic and radiological hazard waste, and they have unique exposures. And another thing is that they can't always prove what they were exposed to. And that's one of the other unique dangers here. And so Congress could very well have concluded that the federal contractors, these private employers, could take care of themselves, and that there was every reason to allow states to regulate these private employers based on their specific circumstances. Ms. Hines, what do you have to say to the government's language, or focus on the language that makes it seem like this is aimed not at the legislature, and by it I mean 3172, is aimed not at state legislatures, but at the state bodies who enforce otherwise generally applicable laws? So the argument is, seems primarily directed towards the word apply. And I think that argument... Well, I think enforcing and requiring compliance with too, yes. But that language presupposes there's a statute that's already been enacted, and the federal government doesn't argue that this language freezes the laws in place as of 1936, which would be the consequence, I think, of not permitting states to enact new laws. I guess I don't understand why that position would freeze the law. I agree with you, and the government, Mr. Stewart said that that's not their position, and I don't see how it could be. But if the statute is aimed at the state authority charged with enforcing and requiring compliance with, that description seems to fit the executive agency. Because at the time that this law was enacted, there was a broad prohibition on any form of regulation of the federal government or those with which it dealt. And so if Congress intended at that time for this language to have very little meaning, it would only have applied to the laws that were existing at the time. So apply, then address what you were getting ready to say about the word apply. That the word apply really does presuppose that there's been an enactment of a law. And so what you really need to do is see what kind of law can the states enact and then apply. And really, there's no... The word term, exclusive jurisdiction, does not allow for a distinction between different types of intergovernmental immunity. This court in Goodyear has already held that this is a waiver of intergovernmental immunity. It's a clear and unambiguous waiver, at least as with respect to direct regulation. And this language really doesn't allow you to distinguish between these different types. If the state can directly regulate under its exclusive jurisdiction, it can also remove all other incidents of federal jurisdiction, including all of intergovernmental immunity. I just want to make sure I understand your mootness argument. Sorry to circle back. But your first point, as I take it, is that in this case, the government only sought a declaratory judgment and injunction, and there's nothing to declare and there's nothing to enjoin because the statute's gone. Point one. Yes. Point two, with respect to the ongoing other cases, you're confident, and you're representing the court, that Washington state courts will retroactively apply the new law and not the old Yes, your honor. Okay. And number three, if you're wrong about that, the government can raise its arguments there. Yes, your honor. And number four, that with the closed cases, they're just closed. The government lost its chance to make those arguments because their final judgments. Yes, your honor. All right. I got it. Thank you. Thank you. Do you think there's any way of certifying this issue to the Washington Supreme Court about what they will do? I understand that that has happened before in the past. It's been a long time, but I believe there is a procedure available to do that. Yes. I don't think it's necessary. The state law is very clear on this point. The federal government is not really challenging that law. They're not challenging the actual language of the statute, which applies retroactively. They're raising sort of an inchoate uncertainty, but that isn't sufficient, I think, to present a live case or controversy, particularly when that alleged uncertainty deals with a collateral case, not this case in chief. Here, there is no ongoing violation. There are no damages. And so in this case, there is no reasonable likelihood of an ongoing effect. What if your prediction turns out to be wrong? Then the federal government can raise that issue in the cases, the 66 live cases. Yeah. And then what? And then the arguments will be made. But in that context, the state will also be as with the federal government, this does apply retroactively. Well, no, play it all out. So they raise it and the state court says, no, the prediction was wrong. Then what? Then at least at that point, you will know there's a live case or controversy. Yeah. And then what? They have to file a new cert petition. If the state courts decide similarly, given the history in this case, it could happen. But I think there is no reasonable likelihood of that happening. Again, multiple levels of speculation that are built in. Because even in the context where there's no retroactive application, we still have our argument that the statutes are coextensive. And even if the courts reject that, that particular worker's claim needs to fall in the gap of that coverage. We're talking a closed universe of a very small number of claims. So there are multiple layers in which this gets resolved based on state law grounds that never have to reach the invalidity of the underlying statute. And so given all of that layer of speculation, it really isn't sufficient to establish a live case or controversy in this case. Thank you, counsel. Justice Thomas, Justice Breyer, anything further? Justice Alito? Thank you, counsel. Thank you. Rebuttal, Mr. Stewart. Thank you, Mr. Chief Justice. First, respondents have said, have characterized our challenge as focusing on the potential collateral consequences of HB 1723. But when we sought declaratory and injunctive relief at the outset against enforcement and application of HB 1723, that is a law that is enforced in the context of individual benefits determinations. And so the very thing we were asking for was an order saying, don't apply and enforce these unique standards in determining individual claimants' entitlement to benefits. And our position is there is still a sufficient possibility that this will wind up happening, that the case does not move. The second thing is that, Justice Kagan, you referred to the possibility of certification. And certainly there is a process by which this court can certify state law questions to the state Supreme Court. It's often done when the court feels that it needs to know what state law dictates before it can resolve the federal question. I've never known of it being done to inform the court's determination whether a case is moot. And I think that's partly because cases like Mission Products really set the applicable framework. Mission Products says, the very existence of substantial uncertainty is a basis for finding the court not to be moot. It is often the case that when the court grants cert on a precise question, the ultimate practical consequences of its ruling are not clear because those depend on subsequent determinations as to other questions. That doesn't make the case moot. The third thing, Justice Gorsuch, you asked about what would the authority be to vacate. We think that the court has recognized a broad authority to vacate based on the principles of equity. Often when the court has vacated judgments below, it's done so in summary orders and therefore the legal principles have not been fleshed out as much as they could be. But we would also say if there is doubt about the court's authority to vacate, the court certainly shouldn't leave the judgment intact. It would really create dismal practical significance of the question presented enough for the court to dig but not enough for the court case to be moot. You can preserve your favorable judgment. The fourth thing, just as a point of clarification, Justice Kagan, you asked about federal employees. Section 3172C says that the authorization doesn't disturb Section 8101 of Title V, and that's the Federal Employees Compensation Act. It's apparent on the face of 3172 that this doesn't affect federal employees. It affects only federal contract workers. But the reason that the court has always framed the anti-discrimination principle as no discrimination against the federal government or those with whom it deals is that it's often predictable that when there is discrimination against federal contractors, the cost of that discrimination will ultimately be borne by the United States. And the last thing in response to Justice Breyer's question, our complaint here is not that Washington is treating the workers too generously. If Washington wanted to spend its own funds to benefit a class of Washington residents that it believed had not been treated as well as they should have by the federal government, its authority to spend state treasury funds wouldn't be impacted by principles of intergovernmental immunity. The problem here is Washington has decided that the United States should be doing more for this class of Washington residents, but it's not within the power of a single state to determine how much the federal government should be doing to solve a national problem. Thank you, Mr. Chief Justice. Thank you, Counsel. The case is submitted.